# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK A. HAZELTINE,<br><br>            Plaintiff,<br><br>    v.<br><br>CHIEF DAVID MONTOYA, et al.,<br><br>            Defendants.<br>_____/ | CASE NO. 1:08-cv–01935-LJO-GBC (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING ACTION, WITH PREJUDICE<br><br>Doc. 24<br><br>OBJECTIONS DUE WITHIN THIRTY DAYS |

**Findings and Recommendations**

**I. Procedural Background**

On December 18, 2008, Plaintiff Rick A. Hazeltine ("Plaintiff"), a civil detainee proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983. Pl. Compl., Doc. 1. On February 17, 2010, the Court found service of the complaint appropriate against Defendants Chief David Montoya, Sgt. R. Dohermann, R. Flores, E. Moreno, A. Alvarado, J. Gonzalez, R. Hernandez, and R. Guajardo ("Defendants")[1] for claims of Fourth Amendment unreasonable search and use of excessive force. Doc. 8. On February 24, 2010, the Court issued a second informational order, advising Plaintiff that Defendants may file a motion for summary judgment and how Plaintiff must oppose the motion in order to avoid dismissal, pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998). Doc. 10. On September 22, 2011, Defendants filed a

---

[1] The Court utilizes the spelling of Defendants' names as printed in their motion for summary judgment. Doc. 24.

motion for summary judgment. Doc. 24. On October 18, 2011, Plaintiff filed a motion for a sixty (60) day extension of time to file an opposition to the motion for summary judgment. Doc. 26. On October 25, 2011, the Court granted Plaintiff's motion for a sixty (60) day extension of time. Doc. 27. As of the date of these findings and recommendations, Plaintiff has not submitted a response to Defendants' motion for summary judgment or requested an extension of time. This matter is deem submitted pursuant to Local Rule 230(l).

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

**III. Plaintiff Did Not Submit a Response to Defendants' Motion for Summary Judgment**

Although Defendants filed their motion for summary judgment in September 2011, and the Court granted Plaintiff an extension of time until December 2011, Plaintiff has not submitted a response to the motion for summary judgment or requested an extension of time. Rule 56(e)(2) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e). If the moving party's statement of facts are not controverted in this manner, a court may assume that the facts as claimed by the moving party are admitted to exist without controversy. *See Beard v. Banks*, 548 U.S. 521, 527 (2006). The Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.1988)). Instead, the "party opposing summary judgment must direct the Court's attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). Therefore, the Court will deem the facts in the record as undisputed.

**IV. Undisputed Facts in the Record**

Plaintiff is a patient confined at Coalinga State Hospital, pursuant to California's Sexually Violent Predators ("SVP") Act. Pl. Compl. at 10, Doc. 1. Plaintiff was incarcerated in the CDCR prison system on or about 1994, and then confined under a civil commitment status in California in 1999. Pl. Dep. at 7:15-25, Def. Mot. Summ. J. (Ex. A), Doc. 24. Plaintiff has been involved in multiple fights during his 20 years of confinement. *Id.* at 26:22-28:9, 30:3-8. Referring to his present accommodations, Plaintiff notes that altercations are "just a way of life in here." *Id.* at 30:5-8. In 2005 or 2006 Plaintiff injured his back during an altercation with another patient. *Id.* at 27:19-28:9.

On October 25, 2008, all named Defendants were employed with Coalinga State Hospital in

a law enforcement position. Montoya Decl. ¶ 2 (Ex. B); Dohermann Decl. ¶ 2 (Ex. C); Flores Decl. ¶ 2 (Ex. D); Moreno Decl. ¶ 2 (Ex. E); Alvarado Decl. ¶ 2 (Ex. F); Gonzalez Decl. ¶ 2 (Ex. G); Hernandez Decl. ¶ 2 (Ex. H); Guajardo Decl. ¶ 2 (Ex. I). Defendant Cdr. David Montoya (aka "Chief David Montoya") was the only Defendant not present in the CSH unit on October 25, 2008, and Defendant Montoya did not participate in the events when Plaintiff refused to allow officers to search his room. Montoya Decl. ¶ 9 (Ex. B); Pl. Dep. at 25:6-7 (Ex. A).

CSH patients in possession of contraband pose a danger to staff and patients. Montoya Decl. ¶ 10 (Ex. B). Tobacco products are a prized commodity and can be the source of patient-on-patient assaults and extortion. *Id.* ¶ 11. Loose wires can be makeshift cigarette lighting devices, or converted to "stingers" with small motors to be used as tattooing devices. *Id.* Felt permanent markers are contraband because of their use in "sniffing" and vandalism. *Id.* Altered items such as strips of fabric pose a serious danger because they can be woven into nooses/strangulation devices or can be used as ties to hide contraband in vents. *Id.* Random searches of CSH patients' living areas for contraband are essential to maintain the safety and security of staff, patients and visitors. *Id.* ¶ 10. Search and seizure of contraband furthers the Hospital Police Officers' goal of preventing and managing assaultive behavior. *Id.* The administrative policy at CSH condones these inspections and searches due to the need for security surrounding non-LPS patients. *Id.* All Defendants in this lawsuit are familiar with Coalinga State Hospital Police Department's policy and procedure regarding search and seizure, and SVP patient rights. Montoya Decl. ¶¶ 10, 12 (Ex. B); Dohermann Decl. ¶ 12 (Ex. C); Flores Decl. ¶ 19 (Ex. D); Moreno Decl. ¶ 12 (Ex. E); Alvarado Decl. ¶ 14 (Ex. F); Gonzalez Decl. ¶ 16 (Ex. G); Hernandez Decl. ¶ 13 (Ex. H); Guajardo Decl. ¶ 11 (Ex. I). All Defendants consider these searches to be mandated by law enforcement and hospital policy, and not in violation of constitutional rights. *Id.*

On October 25, 2008, at approximately 10:20 a.m., Officer Alvarado accompanied Officer Moreno to perform a random search for cause of the living area and property of Plaintiff. Moreno Decl. ¶ 5 (Ex. E); Alvarado Decl. ¶ 5 (Ex. F).) Plaintiff's bed area was approximately 8 by 10 feet. Pl. Dep. at 18:12-26 (Ex. A). Plaintiff refused to move aside to allow officers to search his living area, insisting that he would have to be physically removed. Pl. Compl. at 5; Pl. Dep. at 21:12-13,

31:3-7 (Ex. A). Officer Alvarado contacted Sgt. Dohermann via radio regarding Plaintiff's refusal to comply with the search for contraband. Alvarado Decl. ¶ 7 (Ex. F). Sgt. Dohermann contacted Lt. A. Berard by phone and explained the situation. Dohermann Decl. ¶ 6 (Ex. C). Lt. Berard confirmed that Plaintiff was not exempt from random searches. *Id.* Sgt. Flores reviewed the Random Search Binder for Unit 10, and verified that Plaintiff's room was previously searched on September 4, 2008. Flores Decl. ¶ 7 (Ex. D). Non-LPS patients at CSH may have their living areas randomly searched each week for contraband which threatens the safety of staff, patients and visitors. *Id.*

Sgt. Dohermann and Defendant Sgt. Flores proceeded to Plaintiff's room and requested that Plaintiff allow his room to be searched, but Plaintiff refused. Dohermann Decl. ¶ 7 (Ex. C). Sgt. Flores ordered Officers Gonzalez, Moreno, Hernandez and Guajardo to stand by for crowd control support, because other patients began to crowd the hallways. Flores Decl. ¶ 10 (Ex. D). Plaintiff informed hospital law enforcement that he had been locked up for many years and was tired of random searches. Pl. Compl. at 6; Pl. Dep. at 13:8-10, 20:19-21 (Ex. A). Plaintiff raised his voice at officers and told them to get out of his area. Pl. Compl. at 4. Plaintiff argued, "It is time that I stand up for my rights and you guys don't have a [expletive] warrant." Pl. Dep. at 42:13-17 (Ex. A); Flores Decl. ¶ 11 (Ex. D). Plaintiff told Defendant officers that they would have to physically remove him, handcuff him and take him to jail before he would comply with a contraband search of his area. Pl. Compl. at 5. Dohermann and Flores advised Plaintiff that if he did not comply with their search request, he would be physically removed from the room. Dohermann Decl. ¶ 7 (Ex. C); Flores Decl. ¶ 12 (Ex. D). Sgt. Flores ordered Officers Gonzalez and Moreno to remove Plaintiff from the area. Flores Decl. ¶ 13 (Ex. D). Officer Alvarado left the room to retrieve a video camera. Alvarado Decl. ¶ 10 (Ex. F).

As Officer Moreno and Officer Gonzalez approached, Plaintiff clenched his hands into fists and took a fighting stance. Gonzalez Decl. ¶ 8 (Ex. G); Moreno Decl. ¶ 9 (Ex. E); Flores Decl. ¶ 12 (Ex. D); Guajardo Decl. ¶ 6 (Ex. I). For the safety of the officers and hospital personnel, Officer Gonzalez took control of Plaintiff's left arm. Gonzalez Decl. ¶¶ 9-10 (Ex. G). Plaintiff clenched his fists, and jerked his arm away from Defendant Gonzalez. Gonzalez Decl. ¶ 9 (Ex. G); Dohermann Decl. ¶ 8 (Ex. C); Flores Decl. ¶ 14 (Ex. D). Officer Gonzalez instructed Plaintiff to stop resisting

several times. Gonzalez Decl. ¶ 11 (Ex. G); Hernandez Decl. ¶ 10 (Ex. H). Officer Moreno took control of Plaintiff's right arm, and Plaintiff was lowered onto the bed. Gonzalez Decl. ¶ 10 (Ex. G); Flores Decl. ¶ 14 (Ex. D); Guajardo Decl. ¶ 7 (Ex. I); Dohermann Decl. ¶ 8 (Ex. C). Officer Guajardo observed that Plaintiff was physically resisting the officers who were trying to escort him out of the area. Guajardo Decl. ¶ 7 (Ex. I). Plaintiff tried to forcefully push himself off of the bed. Guajardo Decl. ¶ 7 (Ex. I); Gonzalez Decl. ¶ 11 (Ex. G). Officer Guajardo assisted by holding Plaintiff's upper arms down on the bed. Guajardo Decl. ¶ 8 (Ex. I). Officer Moreno placed the mechanical wrist restraints on Plaintiff. Moreno Decl. ¶ 9 (Ex. E); Gonzalez Decl. ¶ 12 (Ex. G); Guajardo Decl. ¶ 8 (Ex. I). Plaintiff indicates that it took a long time to get the handcuffs on him. Pl. Compl. at 7. Plaintiff does not know who else physically restrained him, besides Officers Gonzalez and Moreno. Pl. Compl. at 6; Pl. Dep. at 22:14-16 (Ex. A). Plaintiff was face down, so he could not see all Defendants but "assumes" that they all touched him during the restraint. Pl. Dep. at 46:15-23 (Ex. A).

When Officer Alvarado returned to the room, Plaintiff was in wrist restraints. Alvarado Decl. ¶ 10 (Ex. F). Officer Gonzalez escorted Plaintiff to interview room T10-2-07. Gonzalez Decl. ¶ 13 (Ex. G). Plaintiff stated that he wanted to be physically removed from the room because people need to "stand up for their rights." Gonzalez Decl. ¶ 13 (Ex. G); Flores Decl. ¶ 16 (Ex. D). Plaintiff stated that he had no other issues. Flores Decl. ¶ 16 (Ex. D). Officer Gonzalez asked Plaintiff if he had any visible injuries, Plaintiff replied "no," and Gonzalez confirmed there were no visible injuries. Gonzalez Decl. ¶ 14 (Ex. G). A nurse was summoned to examine Plaintiff in response to his complaint that his handcuffs were too tight. Flores Decl. ¶ 15 (Ex. D). Plaintiff had remained in handcuffs for approximately fifteen minutes. Pl. Compl. at 7; Pl. Dep. at 36:18-21 (Ex. A). The handcuffs were removed at approximately 10:45 a.m. Flores Decl. ¶ 16 (Ex. D). The handcuffs left Plaintiff's wrists red. Pl. Dep. at 34:11-13 (Ex. A). Plaintiff felt okay afterwards but later had a sore shoulder. Pl. Compl. at 7; Pl. Dep. at 26:1-5 (Ex. A).

Officers Moreno and Alvarado proceeded to search Plaintiff's living area. Moreno Decl. ¶ 10 (Ex. E); Alvarado Decl. ¶ 12 (Ex. F). The following contraband items were removed from Plaintiff's living area: Pieces of wire, a motor from a tape player, tobacco products, staff felt markers

and strips of fabric. Dohermann Decl. ¶ 10 (Ex. C). Defendant Cdr. Montoya was not present and used no force on Plaintiff during the events. Montoya Decl. ¶ 9 (Ex. B). Defendants Sgt. Dohermann, Sgt. Flores, Officer Alvarado and Officer Hernandez used no force whatsoever on Plaintiff during the events on October 25, 2008. Dohermann Decl. ¶ 11 (Ex. C); Flores Decl. ¶ 18 (Ex. D); Alvarado Decl. ¶ 13 (Ex. F); Hernandez Decl. ¶ 12 (Ex. H). Officers Gonzalez, Moreno and Guajardo used only the amount of force necessary to control the situation in order to place Plaintiff in mechanical wrist restraints, in accordance with standard procedure. Gonzalez Decl. ¶ 15 (Ex. G); Moreno Decl. ¶ 11 (Ex. E); Guajardo Decl. ¶ 10 (Ex. I).

All Coalinga State Hospital Police Officers ("HPOs") are trained in the prevention of assaultive acts, with the protection of staff and individuals of the highest priority. Montoya Decl. ¶ 3 (Ex. B). Officers are trained to use the least force necessary to control situations. *Id.* ¶ 4. Police Officers are authorized to use reasonable force under standard CSH policy, beginning with a physical presence of officers, and then a verbal communication, and resorting to a physical intervention only when the prior two techniques have been exhausted. *Id.* ¶ 5. A physical intervention may include the use of restraints, when an injury to patients or staff may be imminent. *Id.* HPO protocol for the use of handcuffs is the same as national professional standards. *Id.* ¶ 6. Law enforcement personnel are trained to use handcuffs when they believe that a subject may pose a safety concern for the officer and / or others; handcuffs may be required if a subject displays assaultive or injurious behavior; and less restrictive means are ineffective. *Id.* CSH policies and procedures can be found in the Administrative Directives. *Id.* ¶ 12. These Directives are created by a collaborative effort involving personnel from multiple disciplines, with final approval vested in the Hospital Executive Director. *Id.* The Directives are reviewed on a yearly basis. *Id.*

//
//
//
//
//
//

## V. Fourth Amendment Unreasonable Search

### A. Legal Standard

The Fourth Amendment prohibits only unreasonable searches. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979); *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1140 (9th Cir. 2011), *cert. denied*, 131 S. Ct. 2964 (2011); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). The reasonableness of the search is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights the search entails. *Bell*, 441 U.S. at 558-59; *Byrd*, 629 F.3d at 1141; *Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 974-75 (9th Cir. 2010); *Nunez v. Duncan*, 591 F.3d 1217, 1227 (9th Cir. 2010); *Michenfelder*, 860 F.2d at 332-34. Factors that must be evaluated are the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell*, 441 U.S. at 559; *Byrd*, 629 F.3d at 1141; *Bull*, 595 F.3d at 972; *Nunez*, 591 F.3d at 1227; *Michenfelder*, 860 F.2d at 332.

The Supreme Court in *Hudson v. Palmer*, 468 U.S. 517 (1984), ruled that a cell search was constitutional because "prisoners have no legitimate expectation of privacy." *Id.* at 530. The Court reasoned that administrators are obligated to "guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises..." and consequently, "wholly random searches are essential to the effective security of penal institutions." *Id.* at 526-529. The same conclusion was reached with respect to pretrial detainees other than convicted prisoners. *See Bell*, 441 U.S. at 558-560 (finding that body cavity searches of pretrial detainees do not violate their Fourth Amendment rights).

Like pretrial detainees, involuntarily committed patients and SVPs may be entitled to some constitutional protections; however, unlike private citizens, SVPs have been adjudged to pose a danger and do not have the same expectation of privacy while confined in the hospital setting. The Ninth Circuit in *Hydrick v. Hunter*, 500 F.3d 978, 990 (9th Cir. 2007), acknowledged a "careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility . . . In weighing those interests, it cannot be ignored that, unlike the plaintiff . . . who was civilly committed because

of mental infirmities, SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others." *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (individuals detained under civil process are subject to "legitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility.")

**B. Analysis**

According to *Hydrick*, SVPs are entitled to a Fourth Amendment protection from "unreasonable" search and seizure - meaning that a search is constitutional provided that it is not arbitrary, retaliatory, and is not well outside the realm of the "legitimate purpose of detention." *Hydrick*, 500 F.3d at 993. By definition, Sexually Violent Predators pose a risk of danger to others. A "Sexually Violent Predator" means a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others. (Cal. Welf. & Inst. Code § 6600(a).)

Even in the controlled detention environment, Plaintiff admits that fighting is "just a way of life." Pl. Dep. at 30:5-8 (Ex. A). For example, Plaintiff has been a participant in multiple fights during his years of incarceration, suffering a back injury as a result. *Id.* at 26:22-28:9, 27:19-28:9, 30:3-8. Consequently, administrators at Coalinga State Hospital are obligated to be vigilant in maintaining the safety and security of everyone at the facility, employees and patients alike. Montoya Decl. ¶ 10 (Ex. B). As a Sexually Violent Predator, Plaintiff is subject to searches based on the same non-punitive concerns for safety and security reflected in a prison setting. *See Jones*, 393 F.3d at 932. Safety and security concerns are prevalent in this institutional setting, especially when Coalinga State Hospital patients in possession of contraband can pose a real danger to themselves and others. Montoya Decl. ¶ 10 (Ex. B). Tobacco products, loose wires, permanent markers and fabric strips are all examples of contraband which is disruptive and can be dangerous. *Id.* ¶ 11. Unannounced searches of SVP patients for contraband are essential to maintain the safety and security of staff, patients and visitors. *Id.* ¶ 10. Indeed, the hospital has the right to conduct searches and seizures of patients' rooms in the interest of preserving the safety and security of the institution. *Hydrick*, 500

F.3d at 993. Moreover, search and seizure of contraband furthers the Hospital Police Officers' goal of preventing and managing assaultive behavior. Flores Decl. ¶ 7 (Ex. D).

The facts show that Defendants provided Plaintiff with reasonable opportunities to cooperate with the contraband search. Dohermann Decl. ¶ 7 (Ex. C); Flores Decl. ¶ 12 (Ex. D). Despite an institutional policy permitting them to conduct random searches, Defendant Sergeants Dohermann and Flores reacted to Plaintiff's protests by briefly suspending the search activity. Alvarado Decl. ¶ 7 (Ex. F); Dohermann Decl. ¶ 6 (Ex. C); Flores Decl. ¶ 7 (Ex. D). Sgt. Dohermann contacted Lt. A. Berard to investigate the validity of the search of Plaintiff's property, while Sgt. Flores reviewed the Random Search Binder for Unit 10 only to find that Plaintiff's room had not been searched for over one month, though CSH permitted weekly searches for contraband. *Id.* Defendants Dohermann and Flores then proceeded to advise Plaintiff that he would be physically removed if he did not step aside to allow the search. Dohermann Decl. ¶ 7 (Ex. C); Flores Decl. ¶ 12 (Ex. D). Plaintiff himself informed Defendants that he wished to be handcuffed before he would allow a search of his property. Pl. Compl. at 5.

Once Plaintiff was safely under control and removed, Sgt. Dohermann and Sgt. Flores instructed Officers Alvarado and Moreno to proceed with a search of SVP Plaintiff's eight by ten foot bed area, revealing multiple items of contraband deemed to present a danger to CSH patients and staff. Moreno Decl. ¶ 10 (Ex. E); Alvarado Decl. ¶ 12 (Ex. F); Dohermann Decl. ¶ 10 (Ex. C). The search of Plaintiff's living area was not arbitrary, retaliatory, nor punitive in nature and therefore complies with principles set out in *Hydrick*, 500 F.3d at 993. In fact, Plaintiff's primary concern with the search on October 25, 2008 was that after many years of being "locked up," he was merely "sick" of his belongings being messed up during searches. Pl. Compl. at 6; Pl. Dep. at 13:8-10, 20:19-21 (Ex. A). Plaintiff also takes issue with the authority of law enforcement officers to maintain institutional security. *Id.* The contraband search was reasonable and in furtherance of a legitimate purpose of detention and therefore not a Fourth Amendment violation. Tobacco products alone have historically been the source of patient-on-patient assaults and extortion at CSH. Montoya Decl. ¶ 11 (Ex. B). The undisputed facts show that the vigilant conduct of the Defendant officers was in accordance with hospital policy; moreover, Plaintiff does not allege the search to be

unconstitutionally arbitrary or retaliatory. The search was therefore well within the "reasonableness" parameters of the Fourth Amendment, and all Defendants are entitled to summary judgment in their favor on this claim. *See Hydrick*, 500 F.3d at 993.

The complaint contains no allegations regarding Defendant Cdr. Montoya (aka "Chief Montoya") or his participation in the events on October 25, 2008. *See* Pl. Compl., Doc. 1. Defendant Montoya was not present in the CSH unit on that date. Montoya Decl. ¶ 9 (Ex. B); Pl. Dep. at 25:6-7 (Ex. A). Therefore, Defendant Montoya is also entitled to summary judgment on Plaintiff's claim of an unreasonable search. Defendant Officers Gonzalez, Hernandez, and Guajardo did not participate in the search of Plaintiff's room for contraband. Moreno Decl. ¶ 10 (Ex. E); Alvarado Decl. ¶ 12 (Ex. F). The Defendant officers were present under orders from Sgt. Flores that they stand by for crowd control. Flores Decl. ¶ 10 (Ex. D). Officer Guajardo's assistance was needed to help secure handcuffs on Plaintiff, but he was otherwise not involved in the property search complained of. Guajardo Decl. ¶ 8 (Ex. I). Consequently, Defendants Gonzalez, Hernandez and Guajardo are entitled to summary judgment in their favor against the claim of a Fourth Amendment search violation. *See Soremekun*, 509 F.3d at 984 (the moving party need merely point out "that there is an absence of evidence" in order to prevail on a motion for summary judgment.)

Thus, Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendants for a Fourth Amendment unreasonable search.

### VI. Fourth Amendment Excessive Force

#### A. Legal Standard

A Fourth Amendment excessive force claim involves the determination of whether the force used "was objectively reasonable in light of the facts and circumstances confronting [the officer], without regard to [his] underlying intent or motivation." *Gregory v. County of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (*quoting Graham v. Connor*, 490 U.S. 386, 397 (1989). This reasonableness requires a balancing of the individual interests against the governmental interests. *Id.* First, the reasonableness of the use of force is analyzed according to "the type and amount of force inflicted." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Then the importance of the governmental interests is evaluated by considering: (1) the severity of the crime at issue; (2) whether the individual

posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade. *See Graham*, 490 U.S. at 396. Third, the gravity of the intrusion is balanced against the government's need for that intrusion. *Id.* It is unlikely that each factor will be applicable in every situation. For example, not all of the *Graham* factors are relevant when the subject is a pretrial detainee. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002). By the same token, not all factors would be relevant when the subject is an SVP in a hospital setting. Additionally, "the *Graham* factors do not adequately take into consideration the governmental interests at stake when resistance occurs in a custodial setting." *Cotton v. County of Santa Barbara*, No. 06-56079, 286 F. App'x 402, 406 (9th Cir. July 22, 2008). Ultimately, the question to be determined is "whether the use of force was objectively reasonable in light of the facts and circumstances confronting the ...officers." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (*quoting Graham*, 490 U.S. at 397).

### B. Analysis

According to the complaint, Plaintiff told Officers Alvarado and Moreno in a "raised voice" that Plaintiff would not allow the weekly random search of his bed area, and further instructed the officers that he would have to be handcuffed and physically removed in order for officers to conduct the search. Pl. Compl. at 4-5. Sgt. Dohermann and Sgt. Flores entered the unit and tried to persuade Plaintiff to comply with the search without a need for physical intervention. Plaintiff argued, "It is time that I stand up for my rights and you guys don't have a [expletive] warrant." Pl. Dep. 42:13-17 (Ex. A); Flores Decl. ¶ 11 (Ex. D). Plaintiff clearly did not wish to peacefully cooperate, taking a threatening stance and clenching his fists. Gonzalez Decl. ¶ 8 (Ex. G); Moreno Decl. ¶ 9 (Ex. E); Flores Decl. ¶ 12 (Ex. D); Guajardo Decl. ¶ 6 (Ex. I).

Plaintiff's refusal to cooperate meant that added law enforcement officers had to be called in to handle the crowd of patients in the hallway and to provide support if necessary to address potentially assaultive behavior. Flores Decl. ¶ 10 (Ex. D). For the safety of patients and staff, Sgt. Flores ordered Officers Gonzalez and Moreno to remove Plaintiff from the area. Flores Decl. ¶ 13 (Ex. D). Officer Gonzalez took control of Plaintiff's left arm, and Officer Moreno took control of Plaintiff's right arm. Gonzalez Decl. ¶¶ 9-10 (Ex. G); Flores Decl. ¶ 14 (Ex. D); Guajardo Decl. ¶

7 (Ex. I); Dohermann Decl. ¶ 8 (Ex. C). Plaintiff pulled away from Officer Gonzalez, and tried to push himself off of the bed. Guajardo Decl. ¶ 7 (Ex. I); Gonzalez Decl. ¶ 11 (Ex. G). Plaintiff's conduct necessitated the intervention of a third officer, Officer Guajardo, who held Plaintiff's upper arms down on the bed until Officer Moreno could fasten the handcuffs. Guajardo Decl. ¶ 8 (Ex. I); Moreno Decl. ¶ 9 (Ex. E); Gonzalez Decl. ¶ 12 (Ex. G). Plaintiff was escorted to an interview room without further incident. Gonzalez Decl. ¶ 13 (Ex. G). In total, Plaintiff remained in wrist restraints for only approximately fifteen minutes. Pl. Compl. at 7; Pl. Dep. at 36:18-21 (Ex. A). Plaintiff contends that his wrists were red, his shoulder was sore, and alleges that the force used by Defendants violated his Fourth Amendment rights. Pl. Compl. at 7; Pl. Dep. at 26:1-5; 34:11-13 (Ex. A). Plaintiff stated that he wanted to be physically removed from the room because people need to "stand up for their rights." Pl. Compl. at 5; Pl. Dep. at 21:12-13, 31:3-7, 42:13-17 (Ex. A); Flores Decl. ¶ 11 (Ex. D).

     Here, Plaintiff was verbally aggressive and physically noncompliant with the officers' directions. Pl. Compl. at 5; Pl. Dep. at 21:12-13, 31:3-7 (Ex. A). He was provided at least two opportunities to move aside for the search, yet Plaintiff took an imposing stance and clenched his fists. Dohermann Decl. ¶ 7 (Ex. C); Flores Decl. ¶ 12 (Ex. D); Gonzalez Decl. ¶ 8 (Ex. G); Moreno Decl. ¶ 9 (Ex. E); Guajardo Decl. ¶ 6 (Ex. I). In fact, Plaintiff insisted that he be removed in handcuffs before he would allow a search of his area for contraband. Pl. Compl. at 5. He pushed up off of the bed, and pulled away from one of the three officers who tried to secure his arms. Guajardo Decl. ¶ 7 (Ex. I); Gonzalez Decl. ¶ 11 (Ex. G). Under these facts, it is clear that Plaintiff was actively resisting the hospital law enforcement. Guajardo Decl. ¶ 7 (Ex. I). The Defendants who were present interpreted Plaintiff's conduct to pose a threat to the safety and security of CSH patients and staff. Gonzalez Decl. ¶ 8 (Ex. G); Moreno Decl. ¶ 9 (Ex. E); Flores Decl. ¶ 12 (Ex. D); Guajardo Decl. ¶ 6 (Ex. I). Moreover, Plaintiff's rebellious conduct created a disruption at CSH because additional security personnel were needed to handle the crowd of patients in the hallway. Flores Decl. ¶ 10 (Ex. D).

     The Defendants' response to Plaintiff's aggression was objectively reasonable. Sgt. Dohermann and Sgt. Flores first exhausted two methods of controlling the situation before physically

removing Plaintiff from the room, i.e., they called for the physical presence of several HPOs, and they attempted to gain Plaintiff's compliance through verbal communication. Alvarado Decl. ¶ 7 (Ex. F); Dohermann Decl. ¶¶ 6-7 (Ex. C); Flores Decl. ¶ 12 (Ex. D). However, Plaintiff escalated the situation by informing officers that he would have to be handcuffed. Pl. Compl. at 5. The three officers who were involved in securing Plaintiff's arms: Gonzalez, Moreno, and Guajardo, stated that they used only the amount of force necessary to place Plaintiff in handcuffs. Gonzalez Decl. ¶¶ 9-10 (Ex. G); Flores Decl. ¶ 14 (Ex. D); Guajardo Decl. ¶ 7 (Ex. I); Dohermann Decl. ¶ 8 (Ex. C). Plaintiff indicates that it took a long time to get the handcuffs on him, which supports the testimony of all other Defendant officers who stated that Plaintiff physically resisted the officers' attempt to remove him from the area. Pl. Compl. at 7. No reasonable juror could find that Defendants did not act in an objectively reasonable manner, because Plaintiff has not shown an excessive use of force. Therefore, Defendants' are entitled to summary judgment as to Plaintiff's claim of Fourth Amendment excessive use of force. Although Plaintiff named Defendant Montoya in the complaint, there are no allegations pertaining to Cdr. David Montoya in any capacity, and he is therefore entitled to summary judgment in his favor on all claims. With regards to Defendants Sgt. Dohermann, Sgt. Flores, Officer Alvarado, and Officer Hernandez, Plaintiff was not sure who was touching him. Pl. Dep. at 46:15-23 (Ex. A). Defendants Dohermann, Flores, Alvarado, and Hernandez stated that they did not use any force whatsoever on Plaintiff. Dohermann Decl. ¶ 11 (Ex. C); Flores Decl. ¶ 18 (Ex. D); Alvarado Decl. ¶ 13 (Ex. F); Hernandez Decl. ¶ 12 (Ex. H). Officer Alvarado was not even present when Plaintiff was handcuffed, having left to retrieve a video camera. Alvarado Decl. ¶ 10 (Ex. F). Any balancing of interests to determine the reasonableness of the force is moot under *Graham* if there has not been a use of force. These Defendants are therefore entitled to summary judgment on the claim of excessive force.

Thus, Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendants for a Fourth Amendment excessive force.

//
//
//

**VII. Conclusion and Recommendation**

Plaintiff has "failed to point to 'specific facts' in the record that could 'lead a rational trier of fact to find' in his favor. *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e))." *Beard*, 548 U.S. at 535. Accordingly, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the undersigned HEREBY RECOMMENDS that the Court GRANT Defendants' motion for summary judgment and that this action be DISMISSED, with prejudice.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   March 6, 2012

UNITED STATES MAGISTRATE JUDGE